## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| RICHARD BROOKS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:21CV609 |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | |
| | ) | |
| Defendant.[1] | ) | |

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Richard Brooks, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Acting Commissioner of Social Security ("Defendant" or "Commissioner"), denying Plaintiff's claims for Disability Insurance Benefits ("DIB"). (Docket Entry 1.) Defendant has filed the certified administrative record (Docket Entry 9 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 13, 16; see also Docket Entry 14 (Plaintiff's Memorandum), Docket Entry 17 (Defendant's Memorandum), Docket Entry 18 (Plaintiff's Reply)). For the reasons that follow, the Court should enter judgment for Defendant.

_____

[1] President Joseph R. Biden, Jr., appointed Kilolo Kijakazi as the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted for Andrew M. Saul as the Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

# I. PROCEDURAL HISTORY

Plaintiff applied for DIB (Tr. 202-13), alleging an onset date of September 1, 2017 (see 202, 205, 210). Upon denial of those applications initially (Tr. 65-77, 96-104) and on reconsideration (Tr. 78-91, 106-13), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 114-15). Plaintiff, his attorney, and a vocational expert ("VE") attended the hearing. (Tr. 30-64.) The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act. (Tr. 9-25.) The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-6, 170-72), making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that disability determination, the ALJ made the following findings later adopted by the Commissioner:

> 1. [Plaintiff] meets the insured status requirements of the . . . Act through December 31, 2022.
>
> 2. [Plaintiff] has not engaged in substantial gainful activity since September 1, 2017, the alleged onset date.
>
> . . .
>
> 3. [Plaintiff] has the following severe impairments: degenerative disc disease; left knee degenerative joint disease; osteoarthritis; chronic obstructive pulmonary disease (COPD); and morbid obesity.
>
> . . .
>
> 4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

5.   . . . [Plaintiff] has the residual functional
capacity to perform sedentary work . . . as [Plaintiff]
is able to lift and carry ten pounds occasionally and
less than ten pounds frequently, stand and walk for no
more than two hours in an eight-hour day, and sit for
eight hours in an eight-hour day.  [Plaintiff] can stand
and walk for no more than thirty minutes at one time to
be followed by at least two minutes in the seated
position where [Plaintiff] can still perform work-related
functions.  When [Plaintiff] is standing and walking,
[Plaintiff] requires the use of a cane in the dominant
right upper extremity.  [Plaintiff] can sit in increments
of no more than one hour at a time to be followed by at
least two minutes of standing where [Plaintiff] can still
perform work-related functions.  [Plaintiff] can never
climb ladders, ropes, or scaffolding.  [Plaintiff] can
occasionally kneel, crouch, and crawl.  [Plaintiff] can
frequently stoop.  [Plaintiff] must avoid concentrated
exposure to hazards, fumes, dusts, gases, and pulmonary
irritants, heat, and humidity.

. . .

6.   [Plaintiff] is capable of performing past relevant
wok as a benefits clerk II and information clerk.  This
work does not require the performance of work-related
activities precluded by [Plaintiff]'s residual functional
capacity.

. . .

7.   [Plaintiff] has not been under a disability, as
defined in the . . . Act, from September 1, 2017, through
the date of this decision.

(Tr. 14-24 (bold font and internal parenthetical citations
omitted).)

## II.  DISCUSSION

Federal law "authorizes judicial review of the Social Security
Commissioner's denial of social security benefits."  Hines v.
Barnhart, 453 F.3d 559, 561 (4th Cir. 2006).  However, "the scope

of [the Court's] review of [such a] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). Plaintiff has not established entitlement to relief under the extremely limited review standard.

## A. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, the Court "must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as

4

adopted by the Commissioner]." <u>Mastro</u>, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." <u>Id.</u> at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," <u>Hall v. Harris</u>, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" <u>id.</u> (quoting 42 U.S.C. § 423(d)(1)(A)).[2] "To regularize the adjudicative process, the Social Security Administration [('SSA')]

---

[2] The Act "comprises two disability benefits programs. [DIB] . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantially identical." <u>Craig</u>, 76 F.3d at 589 n.1 (internal citations omitted).

5

has . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id. (internal citations omitted).

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of the Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[3] A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

---

[3] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [Commissioner] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

On the other hand, if a claimant carries his or her burden at each of the first three steps, the "claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, *i.e.*, "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can perform past relevant work; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Commissioner cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

jobs available in the community," the claimant qualifies as disabled. <u>Hines</u>, 453 F.3d at 567.[5]

## B.  Assignments of Error

Plaintiff argues that the Court should overturn the ALJ's finding of no disability on these grounds:

1) "[t]he ALJ erred by failing to perform a proper function-by-function analysis of Plaintiff's ability to sit, stand and walk when formulating the RFC" (Docket Entry 14 at 4 (bold font and single-spacing omitted));

2) "[t]he structure of the SSA is constitutionally invalid" (<u>id.</u> at 8 (bold font omitted); <u>see also</u> Docket Entry 18 at 4); and

3) "[t]he ALJ's appointment violates the Appointments Clause" (Docket Entry 14 at 17 (bold font omitted); <u>see also</u> Docket Entry 18 at 1-4).

Defendant contends otherwise and seeks affirmance of the ALJ's decision. (<u>See</u> Docket Entry 17 at 3-30.)

### 1. Function-by-Function Analysis

In Plaintiff's first issue on review, he asserts that "[t]he ALJ erred by failing to perform a proper function-by-function analysis of Plaintiff's ability to sit, stand and walk when

---

[5] A claimant thus can establish disability via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five.  Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis.  <u>See, e.g.</u>, <u>Hunter</u>, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

8

formulating the RFC." (Docket Entry 14 at 4 (bold font and single-spacing omitted).) More specifically, Plaintiff highlights his testimony and the medical evidence he believes supports greater limitations on his ability to sit, stand, and walk (see id. at 4-6 (citing Tr. 38-39, 42, 47-50, 57-58, 313, 316-17, 326, 342, 357, 365, 374, 377, 578, 591-92)), and argues that, "despite summarizing [the medical] evidence which is supportive of [Plaintiff]'s testimony" (id. at 6 (citing Tr. 20-21)), "the ALJ failed to explain how he arrived at the conclusion that [Plaintiff] could maintain standing or walking postures for 30 minutes at a time or how he could maintain a seated posture for an hour at a time" (id. at 7 (citing Tr. 18-23)). According to Plaintiff, "[t]he calculation of frequency of position change (much like the calculation of time off task) can be outcome determinative and the ALJ needs to explain how that number was arrived upon." (Id. (citing Holland v. Commissioner of Soc. Sec. Admin., Civ. No. 17-1784, 2018 WL 1970745, at *10 (D. Md. Apr. 25, 2018) (unpublished)).) Plaintiff additionally points out that "[t]he Fourth Circuit recently . . . determin[ed] that the ALJ should have specifically addressed the claimant's testimony regarding how long he [sic] was capable of sitting, especially in light of a sedentary RFC, and, further, that ALJs have to perform a function-by-function analysis of contested and relevant functions." (Id. at 7-8 (citing

9

Dowling v. Commissioner of Soc. Sec., 986 F.3d 377, 388-89 (4th Cir. 2021)).)

Plaintiff further faults the ALJ for failing to clarify which of Plaintiff's statements the ALJ credited and "'which [he] discredit[ed], other than the vague (and circular) boilerplate statement that he did not believe any claims of limitations beyond what he found when considering [Plaintiff's RFC].'" (Id. at 6 (citing Mascio v. Colvin, 780 F.3d 632, 639-40 (4th Cir. 2015)).) In Plaintiff's view, because he has "'met [his] threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [he] is entitled to rely exclusively on subjective evidence to prove the second part of the test, i.e., that [his] pain is so continuous and/or so severe as to prevent [him] from working a full eight hour day.'" (Id. at 8 (quoting Hines, 452 F.3d at 565).) Plaintiff's arguments do not entitle him to relief.

RFC measures the most a claimant can do despite any physical and mental limitations. Hines, 453 F.3d at 562; 20 C.F.R. § 404.1545(a). An ALJ must determine a claimant's exertional and non-exertional capacity only after considering all of a claimant's impairments, as well as any related symptoms, including pain. See Hines, 453 F.3d at 562-63; 20 C.F.R. § 404.1545(b). The ALJ then must match the claimant's exertional abilities to an appropriate level of work (i.e., sedentary, light, medium, heavy, or very

10

heavy).  See 20 C.F.R. § 404.1567.  Any non-exertional limitations
may further restrict a claimant's ability to perform jobs within an
exertional level.  See 20 C.F.R. § 404.1569a(c).

An ALJ need not discuss every piece of evidence in making an
RFC determination.  See Reid v. Commissioner of Soc. Sec., 769 F.3d
861, 865 (4th Cir. 2014).  However, "the ALJ must both identify
evidence that supports his [or her] conclusion and build an
accurate and logical bridge from that evidence to [that]
conclusion."  Woods v. Berryhill, 888 F.3d 686, 694 (4th Cir. 2018)
(internal emphasis, quotation marks, and brackets omitted).  As to
the role of the function-by-function analysis in that
determination, the relevant administrative ruling states: "The RFC
assessment must first identify the individual's functional
limitations or restrictions and assess his or her work-related
abilities on a function-by-function basis. . . .  Only after that
may RFC be expressed in terms of the exertional levels of work,
sedentary, light, medium, heavy, and very heavy."  Social Security
Ruling 96-8p, Policy Interpretation Ruling Titles II and XVI:
Assessing [RFC] in Initial Claims, 1996 WL 374184, at *1 (July 2,
1994) ("SSR 96-8p").

The United States Court of Appeals for the Fourth Circuit has
addressed this administrative ruling and the issue of whether an
ALJ's failure to articulate a function-by-function analysis
necessitates remand.  See Mascio, 780 F.3d at 636–37.

11

Specifically, it stated "that a per se rule is inappropriate given that remand would prove futile in cases where the ALJ does not discuss functions that are irrelevant or uncontested," id. at 636, but that "'remand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review,'" id. (internal brackets and ellipsis omitted) (quoting Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)).

Here, the ALJ did not perform an express function-by-function analysis of Plaintiff's abilities to sit, stand, and walk (see Tr. 18-23); however, no basis for remand exists, because the ALJ's decision nevertheless supplies the necessary "accurate and logical bridge," Woods, 888 F.3d at 694 (internal quotation marks omitted), between the evidence and his findings that Plaintiff's orthopedic conditions and morbid obesity (A) qualified as severe impairments (see Tr. 14), but (B) did not prevent him from performing work involving standing and walking for up to 30 minutes at a time (two hours total) with the use of a cane in the dominant right hand and sitting for up to one hour at a time (eight hours total) (see Tr. 18).

As an initial matter, although the Fourth Circuit recently "reiterate[d ] long-standing [Circuit] law . . . that disability claimants are entitled to rely exclusively on subjective evidence

to prove the severity, persistence, and limiting effects of their symptoms," Arakas v. Commissioner of Soc. Sec. Admin., 983 F.3d 83, 98 (4th Cir. 2020), long-standing cases containing the substance of that holding, such as Craig and Hines (among others), clarify that, "[a]lthough a claimant's allegations about h[is symptoms] may not be discredited solely because they are not substantiated by objective evidence of the [symptoms themselves] or [their] severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the [symptoms] the claimant alleges []he suffers," Craig, 76 F.3d at 595 (emphasis added); see also Hines, 453 F.3d at 565 n.3 (quoting Craig, 76 F.3d at 595). In other words, under the appropriate circumstances, an ALJ may choose to rely exclusively on a claimant's subjective symptom reports to find disabling symptoms; however, Arakas does not compel ALJs to consider only subjective evidence, as such a requirement would conflict with the regulations, which plainly require ALJs to consider a variety of factors, including objective medical evidence, in evaluating the intensity, persistence, and limiting effects of symptoms. See 20 C.F.R. § 404.1529(c) (directing ALJs to assess a claimant's medical history, medical signs and laboratory findings, daily activities, testimony about nature and location of pain, medication and other treatment used to

13

alleviate pain, along with medical opinions from examining and non-examining sources); see also 42 U.S.C. § 423(d)(5)(A) ("Objective medical evidence of pain . . . established by medically acceptable clinical or laboratory techniques (for example, deteriorating nerve or muscle tissue) must be considered in reaching a conclusion as to whether [an] individual is under a disability." (emphasis added)).

Here, in compliance with Arakas, Hines, and Craig, the ALJ considered the objective medical evidence as one part of his evaluation of the intensity, persistence, and limiting effects of Plaintiff's alleged symptoms. (See Tr. 18-23.) As detailed below, the ALJ also considered the opinion evidence of record and Plaintiff's daily activities. (See id.)[6]

_____

[6] Plaintiff's complaint that the ALJ utilized a "vague (and circular) boilerplate statement that he did not believe any claims of limitations beyond what he found when considering [Plaintiff's RFC]" (Docket Entry 14 at 6) misses the mark. The Mascio court held that an ALJ erred by finding that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms [we]re not credible to the extent they are inconsistent with the [ RFC] assessment," because "th[at] boilerplate gets things backwards by implying that ability to work is determined first and is then used to determine the claimant's credibility." Mascio, 780 F.3d at 639 (emphasis added) (internal footnote and quotation marks omitted). The court noted that "the ALJ [] should have compared [the plaintiff]'s alleged functional limitations from pain to the other evidence in the record, not to [her RFC]." Id. In contrast, the ALJ here did not use the forbidden language in his finding regarding the intensity, persistence, and limiting effects of Plaintiff's symptoms. (See Tr. 23.) Moreover, although the ALJ did state that "the medical findings do not support the existence of limitations greater than those reported in the [RFC]" (Tr. 20 (emphasis added)), the ALJ did not compare Plaintiff's subjective symptom reporting to the RFC in violation of Mascio. Indeed, the ALJ "compared [Plaintiff]'s alleged functional limitations from pain to the other evidence in the record" just as instructed by Mascio, 780 F.3d at 639. (See Tr. 20 ("[T]he objective findings in this case fail to provide strong support for [Plaintiff]'s allegations of disabling symptoms and limitations." (emphasis added)).)

14

Turning to Plaintiff's assertions regarding the function-by-function analysis, those assertions fall short because the ALJ's evaluation of Plaintiff's subjective symptom reporting elucidates the ALJ's RFC findings regarding Plaintiff's abilities to stand, walk, and sit. In that regard, the ALJ explicitly acknowledged Plaintiff's statements that, "[d]ue to his conditions and symptoms, . . . he has a number of limitations, some of which involve lifting, squatting, bending, standing, walking, sitting, kneeling, stair climbing, and completing tasks." (Tr. 19 (emphasis added) (citing, inter alia, Tr. 39-40, 42-43, 45-51, 232-39, 243-50, 277-82).) The ALJ, however, also found that the Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record." (Tr. 23.) The ALJ supported that finding by observing that Plaintiff could "travel outside of his home independently, tend to his personal care needs, prepare meals, help with housework including washing dishes and doing laundry, . . . shop in stores, attend church, play guitar, . . . and drive, . . . activities that [we]re not limited to the extent one would expect, given his complaints of disabling symptoms and limitations." (Tr. 20.)

The ALJ's evaluation of the opinion evidence provides a further basis for the sitting, standing, and walking limitations in the RFC. In that regard, the ALJ found "persuasive" the opinions

15

of the state agency medical consultants (Tr. 23), who opined that Plaintiff remained capable of <u>two</u> hours total of standing and walking and <u>six</u> hours total of sitting in an eight-hour workday <u>without any limitation on how long Plaintiff could maintain those postures at one time</u> (<u>see</u> Tr. 72, 86), noting that their "opinions [we]re supported by detailed notes of thorough reviews of the medical record as a whole" and "consistent with the record of evidence including physical examinations" (Tr. 23). The ALJ gave Plaintiff the benefit of the doubt by adding limits on the length of time Plaintiff could sit, stand, and walk at one time. (<u>See</u> Tr. 18.) Furthermore, although Plaintiff contends that a nurse practitioner gave Plaintiff "week-long work limitations . . . which included frequent position changing" (Docket Entry 14 at 5 (citing Tr. 313, 317)), the ALJ discounted those work limitations, noting that they "were intended to be temporary restrictions, i.e., from September 7, 2017, to September 18, 2017 (<u>see</u> Tr. 313, 317), and that they "[we]re not fully consistent with the evidence of record including later physical examinations showing [Plaintiff wa]s less limited" (Tr. 22). The ALJ similarly discounted the October 2017 opinions of Plaintiff's orthopedist Dr. Kenneth P. Barnes that Plaintiff could not drive or work (<u>see</u> Tr. 374), because those opinions "w[ere] intended to be temporary restrictions" and "[were] not fully consistent with the evidence of record including later physical examinations showing [Plaintiff wa]s less limited" (Tr.

16

22).  Even the most recent medical opinion in the record (which the ALJ discounted (see Tr. 22-23)), offered by orthopedist Dr. Ronald A. Gioffre on December 17, 2018, restricted Plaintiff only from "driv[ing] a truck" and "prolonged walking or standing or bending" (Tr. 331), limitations which do not conflict with the RFC (compare Tr. 18, with Tr. 331).

Significantly, beyond Plaintiff's temporary work restrictions in the aftermath of his on-the-job injury in September 2017 (see Tr. 313, 317, 374), none of Plaintiff's medical providers opined that Plaintiff's impairments necessitated greater limits on how long Plaintiff could sit, stand, or walk than the RFC currently reflects, and none opined that Plaintiff needed to change positions at any particular frequency, which undermines Plaintiff's argument. See Lamonds v. Berryhill, No. 1:16CV1145, 2017 WL 1906755, at *10 (M.D.N.C. May 9, 2017) (unpublished) (finding that ALJ's omission of sitting and standing limitations from RFC "d[id] not constitute error, because no medical source of record opined that [the p]laintiff required [such limitations]"), recommendation adopted, slip op. (M.D.N.C. May 24, 2017) (Schroeder, J.); Spicer v. Astrue, No. CIV. 11-3679, 2013 WL 951582, at *14 (D. Minn. Feb. 11, 2013) (unpublished) (rejecting the plaintiff's argument that "ALJ failed to include [a certain sitting and standing limitation] in the RFC finding," which "[wa]s supported by [the plaintiff's] testimony that she c[ould ]not sustain any posture for very long due to

17

constant pain," where "[n]o physician gave her th[at] restriction" and "the record d[id] not otherwise support [that] limitation"), <u>recommendation adopted</u>, 2013 WL 950850 (D. Minn. Mar. 12, 2013) (unpublished).

Moreover, the ALJ's discussion of the medical evidence makes clear that he properly considered Plaintiff's abilities to sit, stand, and walk. At the outset of the ALJ's analysis, he discussed the significant findings in Plaintiff's left knee immediately following his on-the-job injury, including "restricted range of motion . . . pain with palpation, tenderness, swelling, [] effusion[, positive] McMurray's[,] . . . [limited] gait[, and] . . . mild crepitus." (Tr. 20 (citing Tr. 308, 312, 315, 373); <u>see also id.</u> (discussing 9/28/17 MRI of left knee showing "advanced chondromalacia of the medical compartment," "extensive degeneration and tearing of the medial and lateral menisci, a large joint effusion with prominent diffuse subsynovial proliferation in the anterior aspect of the knee, [] mild medial collateral ligament (MCL) bursitis," and "diffuse degeneration of the cruciate and collateral ligaments").) The ALJ, however, noted that other diagnostic imaging of Plaintiff's back, left hip, and left leg showed only mild findings, and that Plaintiff's left knee improved after treatment and a left knee arthroscopy in March 2018:

- On September 7, 2017, <u>six days after Plaintiff's on-the-job injury</u>, "diagnostic images of [Plaintiff]'s lumbar spine . . . showed the leftward curvature and degenerative changes were

18

mild" with "no fracture or subluxation" (Tr. 21 (emphasis added) (citing Tr. 318)), "diagnostic images of the [Plaintiff]'s left hip . . . found no acute bone or joint abnormality (id. (emphasis added) (citing Tr. 320)), and "[d]iagnostic images of [Plaintiff]'s left leg . . . showed no acute . . . fracture . . . and no abnormal periosteal changes" (id. (emphasis added)(citing Tr. 318, 321));

- On September 14 and 18 of 2017, "physical examinations of [Plaintiff]'s lumbar spine found no tenderness and [he] had full range of motion of his back" (id. (emphasis added) (citing Tr. 308, 312, 315)) and, on September 18, 2017, Plaintiff displayed "no tenderness [in his] feet, ankles, or femurs and [he] had full range of motion of his hips" (id. (emphasis added) (citing Tr. 308));

- Throughout September and October 2017, Plaintiff "had [a] negative grind test, Drawer test, and Lachman test and his [left] knee was stable to varus and valgus stress" (id. (emphasis added) (citing Tr. 308, 373)), and "[he] had no focal deficits with . . . 2+ pulses, intact strength, and intact sensation" (id. (emphasis added) (citing Tr. 308, 373)); and

- On November 12, 2018, Plaintiff "had good stability of his left knee," and his "physician believed an injection in [Plaintiff]'s left knee helped" (id. (emphasis added) (citing Tr. 335)).

Furthermore, with respect to Plaintiff's morbid obesity, the ALJ noted that "[t]he medical records showed that [Plaintiff] had body mass indexes (BMIs) as high as 51.81 kg/m$^2$" (Tr. 21; see also Tr. 315, 452) and that, "when assessing [Plaintiff]'s [RFC], the [ALJ] considered any additional and cumulative effects of obesity," including its effects on Plaintiff's "musculoskeletal . . . impairments" (Tr. 21 (emphasis added)).

19

Moreover, by pointing to record evidence Plaintiff believes supports greater limitations on his abilities to sit, stand, and walk, he misinterprets this Court's standard of review. The Court must determine whether substantial evidence, i.e., "more than a mere scintilla of evidence but . . . somewhat less than a preponderance," Mastro, 270 F.3d at 176 (brackets and internal quotation marks omitted), supported the ALJ's findings regarding Plaintiff's abilities to sit, stand, and walk, and not whether other record evidence weighed against those findings, see Lanier v. Colvin, No. CV414-004, 2015 WL 3622619, at *1 (S.D. Ga. June 9, 2015) (unpublished) ("The fact that [the p]laintiff disagrees with the ALJ's decision, or that there is other evidence in the record that weighs against the ALJ's decision, does not mean that the decision is unsupported by substantial evidence.").

Finally, as the Commissioner argues, "[t]his is not a case where the ALJ did not address a relevant area of functioning at all, like in *Dowling*[]; rather this is a case where the ALJ reasonably discussed evidence that supported finding Plaintiff capable of a range of sedentary work, despite his allegations." (Docket Entry 17 at 7.) In Dowling, the plaintiff suffered from two medically determinable impairments, inflammatory bowel disease and an anal fissure, which "caused her to experience discomfort when she s[at] for a prolonged period of time." Dowling, 986 F.3d at 388. In contrast, here, Plaintiff has supplied only vague

20

statements explaining what limits his ability to <u>sit</u>. (<u>See</u> Tr. 42 (testifying that, after sitting for 20 minutes, he "would get stiff," his "knees w[ould] get stiff," and he "would have difficulty <u>standing up</u>" (emphasis added)).)

In light of the foregoing analysis, the Court should deny relief on Plaintiff's first assignment of error.

## 2. Constitutionality of SSA

In Plaintiff's second assignment of error, he contends that "[t]he structure of the SSA is constitutionally invalid." (Docket Entry 14 at 8 (bold font omitted); <u>see also</u> Docket Entry 18 at 4.) Specifically, Plaintiff asserts that "[t]he United States Supreme Court has held that it is unconstitutional for an executive agency to be led by a single individual who serves for a longer term than the President and can only be removed from his position for cause." (Docket Entry 14 at 8 (citing <u>Seila Law LLC v. Consumer Fin. Prot. Bureau</u>, 591 U.S. ____, ____, 140 S. Ct. 2183, 2197 (2020)).) According to Plaintiff, the "constitutionally invalid structure of the [Consumer Financial Protection Bureau ('CFPB')] is identical to that of the SSA," in that "[t]he Commissioner of SSA is the singular head of the [SSA], serves for a six-year term, and cannot be removed by the President except for cause ('neglect of duty or malfeasance in office')." (<u>Id.</u> at 9 (citing 42 U.S.C. § 902(a)(3)).) Plaintiff further maintains that "[t]he ALJ's delegation of authority in this case came from [then-Commissioner]

21

Andrew Saul and is therefore constitutionally defective" (id. (citing Hearings, Appeals, and Litigation Law Manual (HALLEX) § I-2-0-2(A))), as well as that "the ALJ decided this case under regulations promulgated by [then-Commissioner] Saul when [he] had no constitutional authority to issue those rules" (id.). In Plaintiff's view, "the ALJ's decision must [] be vacated because he did not have the authority to hear or decide the case given the delegation of authority from [then-]Commissioner [Saul] who had no constitutional authority to head the [SSA]." (Id.) Those arguments ultimately fail as a matter of law.

As an initial matter, the Commissioner concedes that "42 U.S.C. § 902(a)(3) violates the separation of powers to the extent it is construed as limiting the President's authority to remove the Commissioner without cause." (Docket Entry 17 at 22 (citing U.S. Dep't of Justice ("DOJ"), Office of Legal Counsel, "Constitutionality of the Commissioner of Social Security's Tenure Protection," 2021 WL 2981542 (July 8, 2021) ("2021 OLC Op")).) However, the Commissioner notes that, "even where an unconstitutional statutory removal restriction exists, a plaintiff seeking relief on that basis must show that the restriction actually caused him harm." (Id. at 23 (citing Collins v. Yellen, ___ U.S. ___, ___ - ___, 141 S. Ct. 1761, 1787-89 (2021)).) According to the Commissioner, "Plaintiff's separation of powers argument does not entitle him to a rehearing of his disability

22

claim," because he "cannot show the required nexus between the removal restriction he challenges and the denial of his benefits claim." (Id. (underscoring, capitalization, and single-spacing omitted).) For the reasons that follow, the Commissioner's argument has merit.

Plaintiff first maintains that "the type of causation [argued by the Commissioner] is not required in a case such as this one which involves government actors exercising power which they did not lawfully possess," and that, "[i]n such cases, an individual need not show direct prejudice and instead such harm is presumed." (Docket Entry 14 at 14 (citing Collins, ___ U.S. at ___, 141 S. Ct. at 1788).) Plaintiff points out that "the majority [in Collins] indicated that harm could not be presumed . . . because [that case] did not involve a government actor's exercise of power that the government actor did not lawfully possess." (Id. (citing Collins, ___ U.S. at ___, 141 S. Ct. at 1788).) Plaintiff emphasizes that, "[b]y contrast, . . . neither the ALJ nor the Appeals Council here had a lawful delegation of authority under which to adjudicate and decide this disability claim" and thus "the analysis of *Collins* suggests that harm should be presumed for the violation of [Plaintiff]'s constitutional rights." (Id. (emphasis added).) Plaintiff additionally contends that, "[a]lthough it was decided in the Appointments Clause context, the Fourth Circuit has also held that when structural constitutional claims involving separation of

23

powers are concerned, an individual need not show direct prejudice to their disability claim and instead such harm is presumed." (Id. at 15 (citing Probst v. Saul, 980 F.3d 1015, 1023 (4th Cir. 2020)).)

Plaintiff's attempt to read into Collins a "suggest[ed]" presumption of harm (id. at 14), as well as his reliance on Propst (see id. at 15 (citing Probst, 980 F.3d at 1023)), an Appointments Clause case where the court found unconstitutional the very authority under which a government official acted, see Probst, 980 F.3d at 1023, both fail for the same reason: the unconstitutional removal provision at issue here did not impact then-Commissioner Saul's ability to carry out the duties of his office, see Collins, 141 S. Ct. at 1789 (requiring showing that "unconstitutional provision [] inflict[ed] compensable harm"); see also Decker Coal Co. v. Pehringer, 8 F.4th 1123, 1137 (9th Cir. 2021) ("Collins is controlling with respect to the remedy for any unconstitutionality in the removal provisions."). As another court recently explained:

> [The p]laintiff's argument is similar to arguments the plaintiffs raised and the [United States Supreme] Court rejected in Seila Law and Collins. First, like the plaintiffs in Seila Law, [the [p]laintiff here argues § 902(a)(3)'s removal provision automatically renders all agency action unconstitutional. The [Supreme] Court in Seila Law rejected such an argument[,] observing one section of a statute may violate the Constitution without rendering the entire act void. Seila Law, 140 S. Ct. at 2209. The [Supreme] Court stated the removal limitation of the CFPB Director is the only defect and removal of the defect removes the constitutional violation. The [Supreme] Court concluded the removal limitation was severable because the CFPB is capable of functioning

24

independently of the infirm removal clause. Id. [] ("The provisions of the Dodd-Frank Act bearing on the CFPB's structure and duties remain fully operative without the offending tenure restriction. Those provisions are capable of functioning independently, and there is nothing in the text or history of the Dodd-Frank Act that demonstrates Congress would have preferred no CFPB to a CFPB supervised by the President."); see also [id.] at 2245.

. . .

The Supreme Court in Collins also rejected the argument an invalid removal provision rendered the [Federal Housing Finance Agency ('FHFA')]'s actions void from the outset. The Supreme Court stated there was "no reason to hold that the third amendment [to the agreement between the FHFA and the Department of Treasury] must be completely undone." Collins, [141 S. Ct.] at 1788. The Collins Court further stated "[a]lthough the statute unconstitutionally limited the President's authority to remove the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office. As a result, there is no reason to regard any of the actions taken by the FHFA [challenged on appeal] as void." [Id.] at 1787. Accordingly, the argument the SSA's actions here are either void *ab initio* or became void at some later point due to § 902(a)(3)'s removal clause is not supported by either Seila Law or Collins.

Lisa Y. v. Commissioner of Soc. Sec., 570 F. Supp. 3d 993, 1002-03, (W.D. Wash. 2021) (internal footnote, citation, and stray parenthesis and period omitted); see also Robinson v. Kijakazi, No. 1:20CV358, 2021 WL 4998397, at *3 (W.D.N.C. Oct. 27, 2021) (unpublished) ("[The p]laintiff . . . simply argues that all actions taken by the Commissioner are void due to the unconstitutional removal provision. However, Collins expressly rejects this view." (internal citation omitted)), appeal filed, No. 21-2258 (4th Cir. Nov. 9, 2021).

25

Plaintiff additionally contends that, "even if [] proof of [actual] harm were required, [he] has proven such here." (Docket Entry 14 at 14.) In that regard, Plaintiff asserts that he suffered the following injuries "as a result of the government's violation of his constitutional rights" (id. at 12): (1) "he did not receive a constitutionally valid hearing and adjudication from an ALJ" (id.), (2) "he did not receive a constitutionally valid decision from an ALJ" (id.), (3) "he received an unfavorable decision from this constitutionally illicit ALJ adjudication process" (id.), (4) "he did not receive a constitutionally valid adjudication process from SSA's Appeals Council," (id.), (5) "he did not receive a constitutionally valid determination by the Appeals Council" (id. at 13), and (6) "he received an unfavorable determination from this constitutionally illicit Appeals Council adjudication process" (id.). Thus, Plaintiff urges, "'but for' the unlawful delegation of authority to this ALJ and the Appeals Council judges, those government actors could not have adjudicated and issued the adverse determinations which they did in this case . . . [and] had those government actors not been illicitly delegated authority, they would not have been able to adjudicate and decide these cases - an injury independent of any denial of benefits." (Id. at 15).

Plaintiff's actual harm argument relies on the same faulty premise as his presumed harm argument, i.e., that the

26

unconstitutional removal provision applying to then-Commissioner Saul necessarily nullified his power to delegate authority to the ALJ (and Appeals Council judges) to make a decision in Plaintiff's case. Neither Seila Law nor Collins support that position. See Collins, ___ U.S. at ___, 141 S. Ct. at 1788 n.23 ("[T]he unlawfulness of the removal provision does not strip the FHFA Director of the power to undertake the other responsibilities of his office." (emphasis added)); see also Seila Law, 591 U.S. at ___, 140 S. Ct. at 2209 ("The provisions of the Dodd-Frank Act bearing on the CFPB's structure and duties remain fully operative without the offending tenure restriction. Those provisions are capable of functioning independently . . . ." (emphasis added)). Plaintiff has not provided the Court with any basis on which to distinguish Seila Law or Collins with regard to a showing of actual harm. (See Docket Entries 14, 18.)

Moreover, cases that have found a "redressable" or "traceable" injury arising from the unconstitutionality of Section 902(a)(3) have done so only in the context of deciding as a preliminary matter whether the plaintiff had standing to assert his or her Seila Law/Collins-based claim and did not reach the ultimate merits of the claim. See Dixie C. v. Kijakazi, No. 3:21CV764, 2021 WL 4822838, at *6 (N.D. Tex. Sept. 20, 2021) (unpublished) ("[B]ecause [the p]laintiff has established both traceability and redressability for the purposes of standing, the [c]ourt has

27

standing to hear [the p]laintiff's constitutional claim." (emphasis added)), recommendation adopted, 2021 WL 4820764 (N.D. Tex. Oct. 15, 2021) (unpublished); Sylvia A. v. Kijakazi, No. 5:21CV76, 2021 WL 4692293, at *4 (N.D. Tex. Sept. 13, 2021) (unpublished) ("The [c]ourt finds that [the p]laintiff's separation-of-powers claim is both traceable and redressable such that she has standing to pursue it. Thus, all of [the p]laintiff's claims should proceed to briefing on the merits." (emphasis added)), recommendation adopted, 2021 WL 4622528 (N.D. Tex. Oct. 7, 2021) (unpublished); Albert v. Kijakazi, No. 1:21CV4, 2021 WL 3424268, at *5 (D. Alaska Aug. 5, 2021) (unpublished) ("Because [the] plaintiff has standing to bring his constitutional claim, [the Commissioner]'s motion to dismiss is denied." (emphasis added)); Tafoya v. Kijakazi, No. 21CV871, 2021 WL 3269640, at *3 (D. Colo. July 29, 2021) (unpublished) ("While ultimately, the righteousness *vel non* of [the plaintiff's] arguments on the merits may gain [her] little, if anything, the question presently before [the court] is one of standing, and thus does not implicate the merits." (footnote omitted) (emphasis added)).[7]

_____

[7] Cases exist to the contrary on the standing issue. See Helms v. Commissioner of Soc. Sec., No. 3:20CV589, 2021 WL 5710096, at *3 (W.D.N.C. Dec. 1, 2021) (unpublished) ("The [c]ourt finds that it is implausible that the Commissioner's protection from removal from office, whether constitutional or not, could have affected [the] ALJ[ ]'s decision or any other aspect of the administrative litigation in a material way. Because [the p]laintiff has not shown that she was in any way injured by the removal protection provision, she does not have standing to litigate its constitutionality."); Catherine J.S.W. v. Commissioner of Soc. Sec., No. 3:20CV5602, 2021 WL 5276522, at *8 (W.D. Wash. Nov. 12, 2021) (unpublished) ("Because [the p]laintiff has not shown any
(continued...)

28

Indeed, in two such cases, the courts expressed doubt that the plaintiffs' Collins-based claims could succeed on the merits:

> The outcome of Collins is even less auspicious for [the] plaintiff's substantive claim. The [Supreme] Court there rejected the appellant's argument that the actions of the Director of the FHFA of which appellant complained were void:
>
>> All the officers who headed the FHFA during the time in question were properly *appointed*. Although the statute unconstitutionally limited the President's authority to *remove* the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office.
>
> Collins, 141 S. Ct. at 1787 (emphases in original). Accordingly, "the unlawfulness of the removal provision does not strip the Director of the power to undertake the other responsibilities of his office," including implementing the provision of which the appellant complained. Id. at 1788 n.23. It thus may well be that, even if the removal provisions of the [] Act are unconstitutional, the [SSA]'s ALJs still had authority to issue disability determinations.

Tafoya, 2021 WL 3269640, at *3 n.6; see also Dante v. Saul, Civ. No. 20-702, 2021 WL 2936576, at *5 (D.N.M. July 13, 2021) (unpublished) ("Th[e] rationale [in Collins] appears to undermine

---

[7](...continued)
compensable harm fairly traceable to the actions of former Commissioner [Andrew] Saul, . . . the [p]laintiff's situation is distinguishable from the plaintiff's claims in Collins; [the p]laintiff has failed to establish standing . . . ."); Amanda B. v. Commissioner, Social Security Administration, No. 3:20CV434, 2021 WL 4993944, at *9 (D. Or. Oct. 26, 2021) (unpublished) ("[The p]laintiff . . . does not allege the SSA Commissioner took any action that is in any way related to the ALJ's decision or the decision by the Appeals Council."); Brinkman v. Kijakazi, No. 2:21CV528, 2021 WL 4462897, at *2 (D. Nev. Sept. 29, 2021) (unpublished) ("Because [the p]laintiff offers nothing that traces the decision by the ALJ . . . to any alleged injurious conduct by the SSA Commissioner, [the plaintiff] has not demonstrated traceability and her constitutional violation claim fails for lack of standing.").

29

[the p]laintiff's position that the Commissioner acted outside his constitutional authority when he delegated authority to the ALJ to decide [the p]laintiff's disability claim. But, curiously, the [Supreme] Court's analysis in Collins also supports a finding that [the p]laintiff has standing to assert a constitutional claim under this now-questionable theory." (italics omitted, underscoring added)). Thus, cases decided in the standing context do not provide a basis for the Court to find actual harm to Plaintiff arising from Section 902(a)(3)'s removal provision. See Collins, 141 S. Ct. at 1788 n.24 ("What we said about standing in *Seila Law* should not be misunderstood as a holding on a party's entitlement to relief based on an unconstitutional removal restriction.").

Plaintiff next attempts to show actual harm by asserting "that President Biden wished to terminate Commissioner Saul immediately upon assuming the Presidency," and that "the White House [] affirmatively and immediately sought advice from the DOJ as to whether President Biden could fire [then-]Commissioner Saul after the Supreme Court issued its decision in *Collins*." (Docket Entry 14 at 15-16 (citing 2021 OLC Op., 2021 WL 2981542, at *1).) Plaintiff also notes that "[t]he day after the DOJ issued [the 2021 OLC Op.] in the wake of *Collins* confirming that [then-Commissioner] Saul could be removed from office by the President, President Biden immediately did so." (Id. at 16 (citing Tafoya, 2021 WL 3269640, at *3).) Plaintiff additionally relies on an online article on the

30

Federal News Network website which quotes a statement from an unidentified "White House official" regarding the dismissal of then-Commissioner Saul, indicating that he "'ha[d] undermined and politicized Social Security disability benefits'" and "'reduced due process protections for benefits appeals hearings.'" (Id. (citing https://federalnewsnetwork.com/people/ 2021/07/biden-fires-saul-as-ssa-commissioner (July 9, 2021)).) Plaintiff thus argues that "President Biden's concerns about [then-Commissioner] Saul's policy actions went to the very fundamentals of the entire disability adjudication process." (Id. at 17.) In Plaintiff's view, given that President Biden believed then-Commissioner Saul had undermined due process "'[s]ince taking office' in 2019" (id. at 16 (quoting https://federalnews network.com/people/2021/07/biden-fires-saul-as-ssa-commissioner)), and that "President Biden [] immediately remov[ed then-Commissioner] Saul from office the day after [the] DOJ issued [the 2021 OLC Op.,] . . . it is unmistakable that President Biden would have fired [then-]Commissioner Saul immediately upon taking office had [President Biden] believed it was legal" (id. at 17; see also id. n.5 (pointing out that "the [Supreme] Court indicated in *Collins* that[,] in a situation where 'the President had made a public statement expressing displeasure with actions taken by a Director and had asserted that he would remove the Director if the statute did not stand in the way[,] . . . the statutory provision would **clearly** cause harm'" (quoting

31

*Collins* 141 S. Ct. at 1789 (underscoring added) (bolding supplied by Plaintiff) (some brackets omitted)) and noting that "both the ALJ and the Appeals [Council] Judge who denied Plaintiff's [claim] made their decisions on February 2, 2021 and May 26, 2021 pursuant to delegations of authority from [then-Commissioner] Saul, with whom the President was displeased and [whom the President] would have likely dismissed but for the unconstitutional removal protections" (internal parenthetical citation omitted))). That argument misses the mark.

Although Plaintiff relies on an unidentified White House official's statement expressing dissatisfaction with then-Commissioner Saul's performance since he took office in 2019 (id. at 16 (quoting https://federalnewsnetwork.com/people/2021/07/biden-fires-saul-as-ssa-commissioner)), Plaintiff fails to point to any actual facts demonstrating that President Biden wished to remove then-Commissioner Saul (let alone attempted to remove him and failed to do so as a result of Section 902(a)(3)), prior to the dates on which the ALJ and/or the Appeals Council denied his claim (see id. at 15-17). Moreover, beyond a vague reference to a reduction in unidentified "'due process protections for benefits appeals hearings'" (id. at 16 (quoting https://federalnewsnetwork.com/people/2021/07/biden-fires-saul-as-ssa-commissioner)), Plaintiff has failed to show how President Biden's alleged inability to remove then-Commissioner Saul actually

32

impacted the adjudication of Plaintiff's claim for benefits. As explained by another district court:

> In her reply brief, [the p]laintiff argues "[then-Commissioner] Saul's actions, under constitutional authority or not, have caused specific harm by undermining, politicizing and reducing due process protections to [the p]laintiff's claims." This argument that there is a possibility § 902(a)(3) harmed [the p]laintiff fails to recognize the significant difference between the agency action in <u>Collins</u> and the SSA action here.
>
> In <u>Collins</u>, the Directors of the FHFA adopted an amendment (the "Third Amendment") to certain financial agreements that "materially changed the nature of the agreements" and resulted in the companies in which [the] plaintiffs were shareholders transferring to the U.S. Treasury "at least $124 billion dollars more than the companies would have had to pay" under the prior form of the agreements. <u>Id.</u> at 1774. The plaintiffs in <u>Collins</u> thus had an identifiable basis to contend that[,] but for the unconstitutional removal provision, the President may have removed and appointed a different Director who would have disapproved of the adoption (or implementation) of the Third Amendment. <u>See id.</u> at 1789.
>
> In contrast, there is nothing showing the Commissioner or the SSA implemented new and relevant agency action that may have turned upon the President's inability to remove the Commissioner. <u>[The p]laintiff has not identified any new regulations, agency policies or directives [then-]Commissioner Saul installed that may have affected her claims</u>. [The p]laintiff thus fails to show how or why § 902(a)(3)['s] removal clause possibly harmed her.

<u>Lisa Y.</u>, 570 F. Supp. 3d at 1003 (emphasis added) (internal citation omitted); <u>see also id.</u> at 1004 ("[A] conclusory allegation that due process was denied is not sufficient to raise a colorable constitutional claim." (citing <u>Hoye v. Sullivan</u>, 985 F.2d 990, 992 (9th Cir. 1992))); <u>Shaun A. v. Commissioner of Soc. Sec.</u>, Civ. No. C21-5003, 2021 WL 5446878, at *5 (W.D. Wash. Nov. 22, 2021)

(unpublished) ("[The p]laintiff's reference to an unnamed White House official's justification for [then-]Commissioner Saul's removal [does not] indicate that [the p]laintiff was harmed. . . . Although a representative of the President suggested that [then-]Commissioner Saul was removed from office in part because he had undermined, politicized, and 'reduced due process protections for benefits appeals hearings,' this statement does not establish the existence of a due process violation and [the p]laintiff has failed to identify one."). Similarly, Plaintiff here has not pointed the Court to any "new regulations, agency policies or directives [then-]Commissioner Saul installed that may have affected h[is] claims," Lisa Y., 570 F. Supp. 3d at 1003. (See Docket Entries 14, 18.)

In short, Plaintiff's constitutional claim based on Seila Law and Collins lacks merit.

### 3. Appointments Clause

Plaintiff's third and final issue on review maintains that "[t]he ALJ's appointment violates the Appointments Clause" of the U.S. Constitution. (Docket Entry 14 at 17 (bold font omitted) (referencing U.S. Const. art. II, § 2, cl. 2); see also Docket Entry 18 at 1-4.) In particular, Plaintiff contends that "[t]he ALJ's appointment by Nancy Berryhill on July 16, 2018, violates the Appointments Clause because Nancy Berryhill was no longer the Acting Commissioner on that date and, therefore, lacked the authority to ratify the ALJ's appointment." (Docket Entry 14 at 17

34

(internal parenthetical citation omitted).) According to Plaintiff, Berryhill "became Acting Commissioner of SSA on January 20, 2017, when President Donald Trump assumed office and then[-]Acting Commissioner Carolyn Colvin resigned." (Id. (citing U.S. Gov't Accountability Office ("GAO"), No. B-329853, "Violation of the Time Limit Imposed by the Federal Vacancies Reform Act of 1998–Commissioner, Social Security Administration," www.gao.gov/assets/b-329853.pdf, at 1 (Mar. 6, 2018) ("GAO Notice")).) Plaintiff points out that, on March 6, 2018, the GAO Notice "reported that Berryhill's service as Acting Commissioner under the [Federal Vacancies Reform Act ('FVRA')] had expired on November 16, 2017, and that her service after that date violated the FVRA." (Id. at 18 (citing GAO Notice, at 2).) Plaintiff thus argues that "Berryhill's purported ratification of the ALJ in this case on July 16, 2018 was statutorily ineffective because her period of acting service had expired on November 16, 2017, and the FVRA did not allow her to resume acting as Commissioner at a later date." (Id. (citing Brian T.D. v. Kijakazi, ___ F. Supp. 3d. ___, No. 19CV2542, 2022 WL 179540, at *11 (D. Minn. Jan. 20, 2022), appeal filed sub nom Dahle v. Kijakazi, No. 22-1601 (8th Cir. Mar. 22, 2022).) Plaintiff's argument falls short.

a.  The FVRA

Resolution of Plaintiff's third issue on review turns on interpretation of the FVRA, which:

provides a framework for temporarily filling vacancies in offices for which presidential appointment and Senate confirmation ("PAS") is required. 5 U.S.C. § 3345 et seq. The operative provision of the FVRA, 5 U.S.C. § 3345, sets a default that if a PAS official "dies, resigns, or is otherwise unable to perform the functions and duties of the office," then "the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity subject to the time limitations of section 3346." Id. § 3345(a)(1). Otherwise, "the President (and only the President)" may fill vacant PAS offices on a temporary, acting basis with certain other federal officers. Id. § 3345(a)(2)– (a)(3). . . . The FVRA is the "exclusive means for temporarily authorizing an acting official to perform the functions and duties of any" PAS officer, unless another statute "expressly" creates an alternative mechanism for filling vacancies in a given agency. Id. § 3347. And violations of the FVRA have consequences: "An action taken by any person who is not acting" in compliance with the FVRA "in the performance of any function or duty of a vacant office to which" the FVRA applies "shall have no force and effect," id. § 3348(d)(1), and any such action "may not be ratified," id. § 3348(d)(2).

Northwest Immigrant Rts. Project v. United States Citizenship & Immigr. Servs., 496 F. Supp. 3d 31, 53 (D.D.C. 2020), appeal dismissed, No. 20-5369, 2021 WL 161666 (D.C. Cir. Jan. 12, 2021). The specific provision of the FVRA at issue in this case, governing the time limits on serving in an acting capacity under the FVRA, provides as follows:

(a) . . . the person serving as an acting officer as described under section 3345 may serve in the office--

(1) for no longer than 210 days beginning on the date the vacancy occurs; or

(2) subject to subsection (b), once a first or second nomination for the office is submitted to the Senate, from the date of such nomination for the period that the nomination is pending in the Senate.

36

(b)(1) If the first nomination for the office is rejected by the Senate, withdrawn, or returned to the President by the Senate, the person may continue to serve as the acting officer for no more than 210 days after the date of such rejection, withdrawal, or return.

(2) Notwithstanding paragraph (1), if a second nomination for the office is submitted to the Senate after the rejection, withdrawal, or return of the first nomination, the person serving as the acting officer may continue to serve--

(A) until the second nomination is confirmed; or

(B) for no more than 210 days after the second nomination is rejected, withdrawn, or returned.

5 U.S.C. § 3346 (emphasis added).

b.  <u>Factual Background</u>

In December 2016, President Barack Obama issued a memorandum providing an order of succession within the SSA that listed the Deputy Commissioner of Operations ("DCO") as first in line to serve as Acting Commissioner in the case of vacancies in the positions of Commissioner and Deputy Commissioner. <u>See</u> "Memorandum Providing an Order of Succession Within the Social Security Administration," 81 Fed. Reg. 96337, 2016 WL 7487744 (Dec. 23, 2016) ("Succession Memo"). On January 20, 2017, Donald Trump assumed the Presidency, then-Acting Commissioner Carolyn Colvin resigned, and then-DCO Berryhill began serving as Acting Commissioner pursuant to the Succession Memo, as the offices of Commissioner and Deputy Commissioner remained vacant. <u>See</u> GAO Notice, at 1. On March 6, 2018, the GAO Notice reported that, pursuant to Section 3346(a)(1) of the FVRA, Berryhill's service as Acting Commissioner had expired

37

on November 16, 2017.  See GAO Notice, at 2.[8]  Following the GAO Notice, Berryhill stepped down as Acting Commissioner but continued to lead the SSA as DCO.  See Patterson v. Berryhill, No. 2:18CV193, 2018 WL 8367459, at *1 (W.D. Pa. June 14, 2018) (unpublished).  On April 17, 2018, President Trump nominated Andrew Saul to the position of Commissioner of the SSA, an action which the SSA interpreted as permitting Berryhill to resume serving as Acting Commissioner as of that date under Section 3346(a)(2) of the FVRA, the so-called "spring-back" provision.  See Reuter v. Saul, No. 19CV2053, 2020 WL 7222109, at *15 n.11 (N.D. Iowa May 29, 2020) (unpublished) (internal quotation marks omitted), recommendation adopted, 2020 WL 6161405 (N.D. Iowa Oct. 21, 2020) (unpublished).

On June 21, 2018, the United States Supreme Court issued Lucia v. Securities & Exh. Comm., 585 U.S. ___, 138 S. Ct. 2044 (2018), which held, based on its prior case Freytag v. Commissioner of Int. Rev., 501 U.S. 868 (1991), that the SEC's ALJs qualified as "inferior Officers" subject to the Appointments Clause rather than federal employees, because they "h[e]ld a continuing office established by law" and "exercise[d] . . . significant discretion when carrying out . . . important functions."  Lucia, 585 U.S. at

---

[8] The FVRA added 90 days to the 210-day time limit for Berryhill to serve, because the Commissioner of SSA's vacancy began on President Trump's "transitional inauguration day" (January 20, 2017).  5 U.S.C. § 3349a(b)(1). Thus, November 16, 2017 constituted the 300th day after the January 20th inauguration.

38

___, 138 S. Ct. at 2053 (internal quotation marks omitted).[9]
Because the SEC ALJ who decided the plaintiff's case lacked "the
kind of appointment the [Appointments] Clause requires," i.e.,
appointment by the "President alone," "the Courts of Law," or "the
Heads of Departments," U.S. Const. art. II, § 2, cl. 2, the Supreme
Court "held that the appropriate remedy for an adjudication tainted
with an appointments violation [wa]s a new hearing before a
[different,] properly appointed official." Id. at ___, 138 S. Ct.
at 2055 (internal quotation marks omitted).

Although "[Lucia] did not specifically address the
constitutional status of ALJs who work in . . . the [SSA, t]o
address any Appointments Clause questions involving Social Security
claims, and consistent with guidance from the [DOJ], on July 16,
2018[,] Berryhill ratified the appointments of [the SSA's] ALJs and
approved those appointments as her own." Social Security Ruling
19-1p, Titles II and XVI: Effect of the Decision in Lucia v.
Securities and Exchange Commission (SEC) on Cases Pending at the
Appeals Council, 2019 WL 1324866, at *2 (Mar. 15, 2019) ("SSR 19-

---

[9] The Appointments Clause provides as follows:

[The President of the United States] shall nominate, and by and with
the Advice and Consent of the Senate, shall appoint . . . Officers
of the United States, whose Appointments are not herein otherwise
provided for, and which shall be established by Law: but the
Congress may by Law vest the Appointment of such inferior Officers,
as they think proper, in the President alone, in the Courts of Law,
or in the Heads of Departments.

U.S. Const. art. II, § 2, cl. 2.

1p"). At the time Berryhill did so, she continued to use the title "Acting Commissioner of Social Security." Id.

c. Brian T.D.

As discussed above, Plaintiff relies primarily on the reasoning in Brian T.D. to support his argument that "Berryhill's purported ratification of the ALJ in this case on July 16, 2018 was statutorily ineffective." (Docket Entry 14 at 18 (citing Brian T.D., ___ F. Supp. 3d at ___, 2022 WL 179540, at *11); see also Docket Entry 18 at 2-3.) In that case, the court concluded that, because "Section 3346(a) [of the FVRA] applies to 'the person serving as an acting officer,'" Brian T.D., ___ F. Supp. 3d at ___, 2022 WL 179540, at *11 (emphasis added) (quoting 5 U.S.C. § 3346(a)), and because, "[w]hen Saul was first nominated to become Commissioner on April 17, 2018, Berryhill was not then serving as Acting Commissioner," id. (emphasis added), "by its plain language, § 3346(a)(2) d[id] not apply to Berryhill," id.; see also id. (stating that "[c]ourts have frequently looked to Congress' choice of verb tense to interpret statutes," and that, "[w]hen a [c]ourt is determining the meaning of an Act of Congress, the present tense generally does not include the past" (citing Carr v. U.S., 560 U.S. 438, 447 (2010) (in turn, citing the Dictionary Act, 1 U.S.C. § 1))).

The Brian T.D. court thereafter provided further interpretations of the FVRA that purportedly supported its above-

40

described conclusion regarding Section 3346(a)(2)'s inapplicability

to Berryhill, including that:

- "[s]ubsection [3346](b)(1) states that if a nomination is rejected, withdrawn, or returned, 'the person may **continue to serve** as the acting officer for no more than 210 days[,]'" id. (emphasis supplied by <u>Brian T.D.</u>) (quoting 5 U.S.C. § 3346(b)(1)), and "[s]ubsection [3346](b)(2) states that if a second nomination is unsuccessful, 'the person **serving** as the acting officer may **continue to serve**[,]'" id. (emphasis supplied by <u>Brian T.D.</u>) (quoting 5 U.S.C. § 3346(b)(2));

- "§ 3348 [of the FVRA] confirms this reading[ because, u]nless someone 'is performing the functions and duties' in accordance with the FVRA, the PAS office 'shall remain vacant' until the PAS-appointment is complete," id. at *12 (quoting 5 U.S.C. § 3348(b)(1) & (2)); <u>see also</u> id. at *13 ("[t]o accept [the Commissioner]'s interpretation of § 3346(a)(2) would require the Court to ignore (or rewrite) § 3348");

- the Commissioner's interpretation of Section 3346(a) as "allow[ing] Berryhill to resume acting as Commissioner (that is, to spring back into that position) when President Trump nominated Saul, even though her initial statutory term had expired . . . misreads the statutory language[, because t]he word 'or' modifies the entire provision that limits the acting officer to a period 'no longer than' 210 days from the date the vacancy arose[ and, t]hus, when read with the entirety of subsection [3346](a)(1)[,] 'or' serves to suspend that time limitation, not to create an entirely separate and distinct period of service," id. at *13 (some internal quotation marks omitted) (quoting 5 U.S.C. § 3346(a)(1)).

For the reasons more fully explained below, the Court should

decline to follow the reasoning of <u>Brian T.D.</u> and conclude that

Berryhill properly served as Acting Commissioner under the spring-

41

back provision of Section 3346(a)(2) at the time she ratified the appointments of the SSA's ALJs in July 2018.

d. <u>Analysis</u>

"Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose," <u>Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.</u>, 469 U.S. 189, 194 (1985); however, in construing the text of the FVRA, <u>Brian T.D.</u> misconstrues Congress's use of the present tense verb "serving" in Section 3346(a)(1), <u>Brian T.D.</u>, ___ F. Supp. 3d at ___, 2022 WL 179540, at *11. In that regard, the court noted that "Congress, in enacting § 3346, used the present participle 'serving,' rather than the past or present perfect 'served' or 'has served'" and thus that "Section 3346(a) . . . applies to the person <u>presently</u> serving in that capacity and not to a person who had previously served as Acting Commissioner." <u>Id.</u> (emphasis added).

That argument, however, glosses over the fact that using "the past or present perfect 'served' or 'has served'" to set out the time limits for acting officials under the FVRA would not make sense. Had Congress drafted Section 3346(a) to provide that "the person [who served or who has served] as an acting officer as described under section 3345 may serve in the office for no longer than 210 days," 5 U.S.C. § 3346(a)(1) (dashes and numbering omitted), the Section, by its terms, would provide service time

42

limits _only for individuals who had already served as acting officers_, which renders the time limits nonsensical. <u>See</u> <u>United States v. Turkette</u>, 452 U.S. 576, 580 (1981) (holding that, in construing statutory language, "absurd results are to be avoided"); <u>see also</u> <u>Sorrells v. United States</u>, 287 U.S. 435, 447 (1932) ("All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to . . . an absurd consequence."); <u>Harris v. United States</u>, 215 F.2d 69, 75 (4th Cir. 1954) (holding that "interpretation of a statute leading to absurd . . . results is to be avoided"). Construing the phrase "the person serving as an acting officer" as merely <u>descriptive</u>, i.e., explaining that the time limits apply to acting officers <u>under Section 3345 of the FVRA</u> as opposed to acting officers under other, office-specific vacancy statutes, constitutes a more straightforward and common sense interpretation of Section 3346(a).

Moreover, as the Commissioner argues:

> Reading § 3346(a)'s prefatory phrase to limit that subsection's application to only "the person presently serving in [an acting] capacity," <u>Brian T.D.</u>, [\_\_\_ F. Supp. 3d at \_\_\_,] 2022 WL 179540, at *11, would also create an irreconcilable conflict with § 3345. Under the FVRA, the default rule is that the first assistant automatically becomes the acting official, but the President can subsequently displace the first assistant from her acting role by choosing another acting official. _See_ 5 U.S.C. § 3345(a)(1)-(3); _see also Guedes v. ATF_, 920 F.3d 1, 11 (D.C. Cir. 2019). But if § 3346(a) applied only to a "presently serving" acting officer, it would incorrectly bar the President from designating an alternative acting official. Were the President to designate an acting official after the first assistant had assumed the role by default, the alternative official

43

would not be the person *presently* "serving as an acting
officer as described under section 3345." Under the
*Brian T.D.* court's misinterpretation of that phrase,
§ 3346(a) thus would not permit her to serve *at all*
because § 3346(a)'s prefatory phrase applies to service
under both § 3346(a)(1) and (a)(2). By the same token,
were a first assistant serving as an acting official to
die, resign, or otherwise be unable to serve during the
vacancy, the President would be incapable of replacing
her.

(Docket Entry 17 at 15-16.) The Court should construe the meaning

of the word "serving" in Section 3346(a) in a manner that does not

create inconsistencies with other provisions of the FVRA. See NLRB

v. Wheeling Electric Co., 444 F.2d 783, 787 (4th Cir. 1971) ("The

cardinal rule of statutory construction is that the intent of the

legislative assembly is to be given effect . . . and where a

literal interpretation of a statutory provision would not accord

with the intended purpose of the legislation, or produces an absurd

result, courts must look beyond the plain words of the statute."

(citations omitted)); Milan Puskar Health Right v. Crouch, 549 F.

Supp. 3d 482, 490 (S.D.W. Va. 2021) ("[T]he [c]ourt . . . is

obligated to avoid statutory interpretations that lead to

absurd . . . results if 'alternative interpretations consistent

with the legislative purpose are available.'" (quoting Griffin v.

Oceanic Contractors, Inc., 458 U.S. 564, 575 (1982)).

The Brian T.D. court next found that the "structure and

context" of Section 3346 supported the court's interpretation of

Section 3346(a)(2) as not applying to Berryhill. Brian T.D., ___

44

F. Supp. 3d at ___, 2022 WL 179540, at *11.  In support of that

finding, the court noted that:

> [s]ubsection (b)(1) states that if a nomination is
> rejected, withdrawn, or returned, "the person may
> **continue to serve** as the acting officer for no more than
> 210 days."  5 U.S.C. § 3346(b)(1) (emphasis added).
> Subsection (b)(2) states that if a second nomination is
> unsuccessful, "the person **serving** as the acting officer
> may **continue to serve**."  Id. § 3346(b)(2) (emphasis
> added).  Therefore, the plain language of § 3346,
> indicates that the use of the present participle is
> deliberate — only a person presently serving may continue
> to serve.  The plain language of § 3346(a)(2) means that
> it only applies to a person presently serving as Acting
> Commissioner if at the time of nomination, someone "is
> performing the functions and duties" in accordance with
> the FVRA.  There is no good reason for construing the
> word "serving" when used in the first paragraph of
> § 3346(a) differently than when it is used in § 3346(b).

Brian T. D., ___ F. Supp. 3d at ___, 2022 WL 179540, at *11.

Comparison of the language of subsection (b)(1) with that of

subsection (b)(2), however, makes clear that the word "serving"

does not possess the talismanic significance the Brian T.D. court

would like to assign it.  In subsection (b)(1), the language "the

person serving as the acting officer" does not exist; rather, that

section merely provides that, if the first nomination for the

office fails, "the person may continue to serve as the acting

officer for no more than 210 days."  5 U.S.C. § 3346(b)(1)

(emphasis added).  Despite that difference in language, i.e.,

"person" in subsection (b)(1), 5 U.S.C. § 3346(b)(1), and "person

serving as the acting officer" in subsection (b)(2), 5 U.S.C.

§ 3346(b)(2) (emphasis added), both subsections apply to the same

45

type of individual – a person already in the role of an acting officer by virtue of a nomination for the office to the Senate, <u>see</u> 5 U.S.C. § 3346(b).

The <u>Brian T.D.</u> court next maintained that "§ 3348 confirm[ed its] reading" of Section 3346(a)(2) because, "[u]nless someone 'is performing the functions and duties' in accordance with the FVRA, the PAS office 'shall remain vacant' until the PAS-appointment is complete." <u>Brian T.D.</u>, ___ F. Supp. 3d at ___, 2022 WL 179540, at *12 (quoting 5 U.S.C. § 3348(b)(1)). The court disagreed with the Commissioner's "interpret[ation of] § 3346 as providing a person with authority to serve in an acting role (as distinct from merely defining the length of that service)," and pointed out that "§ 3345 [] provides the authority to act as an officer, while § 3346 merely defines the period of that service." <u>Id.</u> at *13. In other words, the court reasoned, "[s]omeone cannot avoid § 3348's directive that the 'office shall remain vacant' by invoking § 3346 as authority to serve as acting officer because § 3348 requires that person to already be performing duties according to §§ 3345, 3346, and 3347." <u>Id.</u>

The <u>Brian T.D.</u> court provided no authority for its interpretation that Section 3346 could not avoid the "remain vacant" provision of Section 3348(b) and authorize Berryhill to spring back into her role as Acting Commissioner upon the nomination of Saul, because Section 3346 prescribes only "time

46

limits," id. See id. Section 3348(b)(1) explicitly ties the
"remain vacant" provision to the phrase "performing the functions
and duties in accordance with sections 3345, 3346, and 3347," 5
U.S.C. § 3348(b)(1) (emphasis added), and, because Berryhill
immediately resumed performing the duties of the office in an
acting capacity upon Saul's nomination in accordance "with
§ 3346(a)(2) (as well as § 3345(a)), § 3348(b)(1) did not require
the office to 'remain vacant'" (Docket Entry 17 at 18).

The Brian T.D. court further based its interpretation of
Section 3346(a)(2)'s inapplicability to Berryhill on the following
analysis of the meaning of the word "or":

> [The Commissioner's] interpretation [of Section 3346(a)]
> misreads the statutory language. The word "or" modifies
> the entire provision that limits the acting officer to a
> period "no longer than" 210 days from the date the
> vacancy arose. Thus, when read with the entirety of
> subsection (a)(1) "or" serves to suspend that time
> limitation, not to create an entirely separate and
> distinct period of service. A person serving as an
> acting officer may do so "for no longer than 210 days
> beginning on the date the vacancy occurs; **or** . . . once
> a first or second nomination for the office is submitted
> to the Senate," during the pendency of that nomination.
> Id. § 3346(a) (emphasis added). The ordinary usage of
> the word "or" is disjunctive, indicating an alternative.
> *United States v. Smith*, 35 F.3d 344, 346 (8th Cir. 1994).
> In this statute "or" serves to provide an alternative
> **length** of service not to create a series of
> non-contiguous periods of service. If the statute were
> read to create three distinct periods of service — the
> initial 210 days, the first nominee period, and the
> second nominee period — the statute would have used the
> word "and" to separate the three periods of service.
>
> Construing the word "or" to mean "and," as [the
> Commissioner] argues for here, is conjunctive and
> "clearly in contravention of its ordinary usage." *Id.*

Case 1:21-cv-00609-CCE-LPA   Document 19   Filed 07/20/22   Page 47 of 58

The plain reading and ordinary usage of the word "or" in § 3346(a) is that a person serving as Acting Commissioner may serve for a 210-day period from the start of the vacancy, or if the person is already "serving as acting officer" according to the FVRA, may continue serving during the pendency of a timely nomination. The 210-day period is a limitation on Berryhill's acting service and after the 210-day limitation had expired, she could not later return to acting service, turning § 3346's "or" into an "and."

Brian T. D., ___ F. Supp. 3d at ___, 2022 WL 179540, at *13 (emphasis supplied by Brian T.D.).

The Commissioner persuasively argues that the Brian T.D. court's above-quoted interpretation of the word "or" in Section 3346(a)(1) constitutes an unreasonable construction of that commonly-used word:

The use of "or" to mean either one or both of two options is routine. "The word 'or' has an inclusive sense (A or B, or both) as well as an exclusive one (A or B, not both)." Varga v. Colvin, 794 F.3d 809, 815 (7th Cir. 2015). "'The meaning of or is usually inclusive.'" Tex. Std. Oil Co. v. Forest Oil Corp., No. 05-490, 2008 WL 11399510, at *4 (S.D. Tex. Jan. 3, 2008) (quoting Bryan A. Garner, Dictionary of Modern Legal Usage 624 (2d ed. 1995)). For example, if a server comes to a table and asks whether anyone would like "dessert or coffee," no one would interpret that to preclude ordering both.

(Docket Entry 17 at 11 n.2 (emphasis added).) Indeed, as well-explained by another district court:

Authorities agree that . . . or has an inclusive sense as well as an exclusive sense." Bryan A. Garner, Garner's Dictionary of Legal Usage 639 (3d ed. 2011). In its inclusive sense, "or" means "A or B, or both." Id. In its exclusive sense, "or" means "A or B, but not both." Id. Although "or" is used in both senses in common usage, "[t]he meaning of or is usually inclusive." Id. (quoting Scott J. Burnham, The Contract Drafting Guidebook 163 (1992)) (internal quotation marks omitted).

48

> InfoSync argues as if the court must choose between construing "or" in its exclusive sense or construing it to mean "and." But . . . both senses of "or" are commonly used. In fact, the inclusive use of "or" is the more common.

B-50.com, LLC v. InfoSync Servs., LLC, No. 3:10CV1994, 2014 WL 285096, at *6-7 (N.D. Tex. Jan. 27, 2014) (unpublished) (emphasis added) (certain citations omitted); see also Great Lakes Ins. SE v. Lassiter, No. 21-21452-CIV, 2022 WL 1288741, at *10 (S.D. Fla. Apr. 29, 2022) (unpublished) ("If the [p]olicy sought to use 'or' in an exclusive sense, then it would have prevented such overlap by prefacing the definition with a qualifier like 'either.'" (emphasis added)); Mason v. Range Res.-Appalachia LLC, 120 F. Supp. 3d 425, 445 (W.D. Pa. 2015) ("'Stating the matter broadly, we can say that in a permissive sentence the inclusive "or" is interchangeable with the several "and." Again, this does not say that "and" means "or." It says that in such a context the two words are reciprocally related: the implied meaning of one is the same as the express meaning of the other.'" (quoting Maurice B. Kirk, Legal Drafting: The Ambiguity of "And" and "Or," 2 Tex. Tech L. Rev. 235, 243 (1971))); Allstate Ins. Co. v. Plambeck, 66 F. Supp. 3d 782, 788 (N.D. Tex. 2014) (noting that, "[a]bsent a qualifying 'either,' 'or' is typically interpreted in the inclusive manner" and explaining that statute in question lacked "limiting words or phrases — such as 'either' or 'but not both' — that might support

49

reading [the statute]'s use of 'or' in the 'exclusive' sense"
(emphasis added) (internal quotation marks omitted)).

Here, the word "or" appears in a permissive sentence, i.e.,
"the person serving as an acting officer as described under section
3345 <u>may serve</u> in the office," 5 U.S.C. § 3346(a) (emphasis added),
without qualifiers such as "either" and "but not both," <u>see</u> <u>id.</u>
Accordingly, the Court should interpret the word "or" in Section
3346(a)(1) in its more common, inclusive sense to permit Berryhill,
after serving as Acting Commissioner for 300 days following the
vacancy under Section 3346(a)(1), to spring back into that role
upon Saul's nomination to the Senate under Section 3346(a)(2). <u>See</u>
<u>N.L.R.B. v. SW Gen., Inc.</u>, ___ U.S. ___, ___, 137 S. Ct. 929, 939,
(2017) (rejecting NLRB's interpretation of Section 3345 of the
FVRA, while noting that Congress "could easily have chosen clearer
language," as well as finding that "'[t]he fact that Congress did
not adopt [] readily available and apparent alternative [language]
strongly support[ed]'" the Supreme Court's interpretation of
Section 3345 (brackets omitted) (quoting <u>Knight v. Commissioner</u>,
552 U.S. 181, 188 (2008)).[10]

_____

[10] Other sections of the FVRA make clear that Congress knew how to include
language indicating that certain time periods for service did not permit breaks
in service:

> [T]he President (and only the President) may direct an officer who
> is nominated by the President for reappointment for an additional
> term to the same office in an Executive department <u>without a break</u>
> <u>in service</u>, to continue to serve in that office subject to the time
> limitations in section 3346, until such time as the Senate has acted
> to confirm or reject the nomination, notwithstanding adjournment
> (continued...)

Consistent with that view, the legislative history of the FVRA makes clear that Congress intended "or" in its inclusive sense, and that Section 3346(a)(2) constitutes a second, permissible period of service for Berryhill:

> Under new section 3346(a)(2), and subject to section 3346(b), an acting officer may serve more than 150 days if a first or second nomination is submitted to the Senate, and may serve while that nomination is pending from the date the nomination is submitted. The acting officer may serve even if the nomination is submitted after the 150 days has passed although . . . the acting officer may not serve between the 151st day and the day the nomination is submitted.

S. Rep. 105-250, reporting on Senate Bill 2176, "Federal Vacancies Reform Act of 1998," 1998 WL 404532, at *14 (July 15, 1998) (emphasis added).[11] Notably, beyond the change from 150 days to 210 days, Section 3346 of Senate Bill 2176 contains the exact same language as Section 3346 of the FVRA. Compare S.2176, 105th Cong., § 3346, available at www.congress.gov/bill/105th-congress/senate-bill/2176/text, with 5 U.S.C. § 3346.

Plaintiff disputes the Commissioner's reliance on the legislative history of the FVRA, arguing that "it is telling that the Senate Report language [in Section 3348] did not make it into

---

[10](...continued)
sine die.

5 U.S.C. § 3345(c)(1) (emphasis added); see also 5 U.S.C. § 3346(b)(1) ("If the first nomination for the office is rejected by the Senate, withdrawn, or returned to the President by the Senate, the person may continue to serve as the acting officer for no more than 210 days after the date of such rejection, withdrawal, or return." (emphasis added)).

[11] The version of the FVRA Congress ultimately passed expanded the term an acting official could serve from 150 days to 210 days. See 5 U.S.C. § 3346(a).

the final version of the [FVRA]." (Docket Entry 18 at 3.) Section 3348(b) of Senate Bill 2176 provided, in pertinent part, as follows:

> (1) if the President does not submit a first nomination to the Senate to fill a vacant office within 150 days after the date on which a vacancy occurs--
>
> (A) the office shall remain vacant <u>until the President submits a first nomination to the Senate</u>; and . . .
>
> (2) if the President does not submit a second nomination to the Senate within 150 days after the date of the rejection, withdrawal, or return of the first nomination--
>
> (A) the office shall remain vacant <u>until the President submits a second nomination to the Senate</u>.

S.2176, 105th Cong., § 3348(b), available at www.congress.gov/bill/105th-congress/senate-bill/2176/text (emphasis added) (quotation marks omitted). The <u>Brian T.D.</u> court found that the absence of the above-emphasized language in FVRA's final text supported the court's interpretation of Section 3346(a)(2) as not applying to Berryhill:

> The FVRA's final text does not include the express "spring-back" language. Publ. L. 105-277, § 151, 112 Stat. 2681 (Oct. 21, 1998). Enacting the FVRA included a "period of intense negotiations" and resulted in "a compromise measure." *N.L.R.B.*, [___ U.S. at ___,] 137 S. Ct. at 942. "What Congress ultimately agrees on is the text that it enacts, not the preferences expressed by certain legislators." *Id.*
>
> Here, the Senate Report shows that the Senate considered allowing an officer who had previously acted as Commissioner to return to acting service upon a nomination to the Senate, however Congress chose not to include such language in the final, enacted version of the FVRA. Certainly, the original language of § 3348

52

demonstrates that if Congress had intended the FVRA to contain a spring back provision they were able to craft such language to clearly and unambiguously express that intent. At best the reliance on the Senate Report illustrates the folly of attempting to discern legislative intent from statements made during the legislative process. *See id.* at 942-93; *see also Milner v. Dep't of Navy*, 562 U.S. 562, 572[] (2011) ("When presented, on the one hand, with clear statutory language and, on the other, with dueling committee reports, we must choose the language.").

Brian T.D., ___ F. Supp. 3d at ___, 2022 WL 179540, at *14-15.

Brian T.D.'s reasoning falls short, because the Senate Report did not tie its interpretation of Section 3346(a)(2) as a spring-back provision to the language in Section 3348(b) providing that the office remain vacant "until the President submits a first [or second] nomination to the Senate," 5 U.S.C. § 3348(b) (emphasis added); rather, the Report grounded its interpretation in the language of Section 3346 itself:

Under new section 3346(a)(2), . . . [t]he acting officer may serve even if the nomination is submitted after the 150 days has passed although . . . the acting officer may not serve between the 151st day and the day the nomination is submitted.

S. Rep. 105-250, 1998 WL 404532, at *14 (emphasis added). As the Commissioner argued in Brian T.D., the final version of the FVRA likely did not include the language in question from Senate Bill 2176's Section 3348, because the plain text of Section 3346(a) rendered that language unnecessary. See Brian T.D., ___ F. Supp. 3d at ___, 2022 WL 179540, at *14.

53

In addition, cases interpreting the application of Section 3346(a)(2) have also concluded that Section 3346(a)(2) serves as a spring-back provision.  In a case outside of the SSA context, another district court held as follows:

> Executive Order [13753 ('EO 13753')] designated its order of succession [for the position of Secretary of the Department of Homeland Security ('DHS')] pursuant to the FVRA, which includes a 210-day time limit for acting officials "beginning on the date the vacancy occurs."  5 U.S.C. § 3346(a)(1).  Here, [Secretary of DHS Kirstjen] Nielsen resigned on April 10, 2019, and far more than 210 days passed before [the Acting Secretary of DHS under EO 13753 Peter] Gaynor purported to amend the order of succession [to list DHS Under Secretary for Strategy, Policy, and Plans Chad Wolf as Acting Secretary of DHS], potentially rendering [Gaynor's] action void.  But a separate provision of the FVRA permits an acting official to serve "from the date of" a first nomination for the vacant office and "for the period that the nomination is pending in the Senate."  Id. § 3346(a)(2).  Because President Trump nominated Wolf [to serve as Secretary of DHS] the same day that Gaynor purported to amend the order of succession, Gaynor was lawfully serving as Acting Secretary under [EO 13753] and the FVRA at the time he amended the order of succession.

Northwest Immigrant Rts. Project, 496 F. Supp. 3d at 57–58 (emphasis added).  Cases addressing Section 3346(a)(2) in the setting of a claim for benefits under the SSA have also found it to provide Berryhill with the authority to spring back into her role as Acting Commissioner.  See Williams v. Kijakazi, No. 1:21CV141, 2022 WL 2163008, at *3 (W.D.N.C. June 15, 2022) (unpublished) (characterizing holding in Brian T.D. as "an outlier that conflicts with the plain text of the FVRA, nearly every other court to address the issue, as well as the views of the Executive Branch and

54

the Legislative Branch - all of which agree that § 3346(a)(2) permits an acting official serving under the FVRA to serve during the pendency of a first or second nomination even when that nomination was submitted after the initial 210-day period for acting service has expired"); Early v. Kijakazi, No. 5:21CV96, 2022 WL 2057467, at *4 (W.D.N.C. June 7, 2022) (unpublished) (expressly disagreeing with Brian T.D. and holding: "[T]he plain language of 5 U.S.C. § 3346 allows for Ms. Berryhill to have resumed her role as Acting Commissioner on the date that Andrew Saul was nominated. Consequently, she had the necessary statutory authority to ratify the appointment the ALJs in 2018 and [the p]laintiff's [] argument fails."); Thomas S. v. Commissioner of Soc. Sec., No. C21-5213, 2022 WL 268844, at *3 (W.D. Wash. Jan. 28, 2022) (unpublished) ("The FVRA contains a 'spring-back' provision that enabled Berryhill to resume her role as Acting Commissioner as of the date that [] Saul was nominated for Commissioner in April 2018."); Reuter, 2020 WL 7222109, at *15 ("Berryhill actually held the title of Acting Commissioner of Social Security twice. She first assumed the role on January 21, 2017. . . . Immediately following the GAO[ Notice], [] Berryhill stepped down from her role as Acting Commissioner and continued to lead the agency from her [DCO] position of record. . . . [H]owever, on April 17, 2018, the President nominated [] Saul to be the next Commissioner of Social Security. . . . The FVRA contains a 'spring-back' provision that

55

enabled Berryhill to resume her role as Acting Commissioner as of the date of [] Saul's nomination."); <u>Patterson</u>, 2018 WL 8367459, at *1 ("The FVRA contains a 'spring-back' provision that enabled Berryhill to resume her role as Acting Commissioner as of the date of [] Saul's nomination.").

Finally, the DOJ has, <u>since at least 1999</u>, interpreted Section 3346(a)(2) of the FVRA to constitute a spring-back provision:

> <u>The [FVRA] incorporates a spring-back provision, which permits the acting officer to begin performing the functions and duties of the vacant office again upon the submission of a nomination, even if the 210-day period expired before that nomination was submitted</u>. If the 210-day limitation period expires before the President has submitted a nomination, the restrictions in § 3348 of the Act, which bar anyone from serving in an acting capacity, become operative. <u>If thereafter the President submits a nomination, an acting officer is again able to perform the functions and duties of the office as of the date the nomination is submitted.</u>

DOJ, Office of Legal Counsel, "Guidance on Application of Federal Vacancies Reform Act of 1998," 1999 WL 1262050, at *6-8 (Mar. 22, 1999) (emphasis added) (parentheticals omitted). Like DOJ, the GAO - the same agency that found a violation in Berryhill's service beyond 300 days after the resignation of Colvin, <u>see</u> GAO Notice, at 1 - also interprets Section 3346(a)(2) of the FVRA to provide spring-back authority to resume acting service upon a nomination to the Senate, <u>see</u> GAO, No. B-328888, "Violation of the 210-Day Limit Imposed by the Federal Vacancies Reform Act of 1998 — Department of Energy, Director of Office of Science," www.gao.gov/assets/b-328888.pdf, at 2 (Mar. 3, 2017) (reporting that the FVRA

56

"contains a <u>spring-back provision</u> that allows an acting official to resume performing the duties of the office once a first or second nomination is submitted to the Senate for the period that such nomination is pending in the Senate" and thus that acting official <u>whose initial 210-days had expired "could resume her service as Acting Director . . . when the President submitted [a] nomination to the Senate</u>" (emphasis added)).

In sum, the plain language of Section 3346(a) of the FVRA makes clear that Section 3346(a)(2) provided authority for Berryhill to resume service as Acting Commissioner as of the date of President Trump's nomination of Saul for Commissioner on April 17, 2018. Further, the FVRA's legislative history, caselaw interpreting Section 3346(a)(2), and interpretations of that Section from the DOJ and the GAO all support the interpretation of Section 3346(a)(2) as a spring-back provision. As such, the Court should find that Berryhill lawfully ratified the SSA's ALJs' appointments as her own on July 16, 2018, and thus that Plaintiff's third issue on review fails as a matter of law.

### III.  <u>CONCLUSION</u>

Plaintiff has not established an error warranting relief.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's Motion for

Judgment on the Pleadings (Docket Entry 13) be denied, that Defendant's Motion for Judgment on the Pleadings (Docket Entry 16) be granted, and that this action be dismissed with prejudice.

_____/s/ L. Patrick Auld_____
**L. Patrick Auld**
**United States Magistrate Judge**

July 20, 2022